# SUPREME COURT OF THE UNITED STATES

## COALITION LIFE *v.* CITY OF CARBONDALE, ILLINOIS

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 24–57.   Decided February 24, 2025

The petition for a writ of certiorari is denied.  JUSTICE ALITO would grant the petition for a writ of certiorari.

JUSTICE THOMAS, dissenting from the denial of certiorari.

In *Hill* v. *Colorado*, 530 U. S. 703 (2000), this Court upheld a state law restricting peaceful speech within 100 feet of abortion clinics.  It was clear at the time that *Hill*'s reasoning "contradict[ed] more than a half century of well-established First Amendment principles."  *Id.*, at 765 (Kennedy, J., dissenting); see also *id.*, at 742 (Scalia, J., joined by THOMAS, J., dissenting).  A number of us have since described the decision as an "absurd," "defunct," "erroneous," and "long-discredited" "aberration" from the rest of our First Amendment jurisprudence.  See *City of Austin* v. *Reagan Nat. Advertising of Austin, LLC*, 596 U. S. 61, 86–87, 92, 103–104 (2022) (THOMAS, J., joined by GORSUCH and BARRETT, JJ., dissenting) (internal quotation marks omitted).  We have long stopped applying *Hill*.  See, *e.g.*, *City of Austin*, 596 U. S., at 76.  And, a majority of this Court recently acknowledged that *Hill* "distorted [our] First Amendment doctrines."  *Dobbs* v. *Jackson Women's Health Organization*, 597 U. S. 215, 287, and n. 65 (2022).  Following our repudiation in *Dobbs*, I do not see what is left of *Hill*.  Yet, lower courts continue to feel bound by it.  The Court today declines an invitation to set the record straight on *Hill*'s defunct status.  I respectfully dissent.

## I

*Hill* involved a 1993 Colorado statute that established

"buffer zones" around abortion clinics. The law made it a crime for any person, within 100 feet of any "health-care facility" entrance, to "knowingly approach" within 8 feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." Colo. Rev. Stat. §18–9–122(3) (2024). Put another way, Colorado's law—still in effect today—prohibits unconsented "sidewalk counseling" within 100 feet of abortion clinics.

Shortly after the law's enactment, a group of self-described sidewalk counselors who sought to peacefully "educate" and "counsel" "passersby about abortion and abortion alternatives" challenged the law under the First Amendment. *Hill*, 530 U. S., at 708, 710 (internal quotation marks omitted). This Court upheld the law as a content-neutral time, place, and manner restriction. *Id.*, at 725.

*Hill*'s errors were numerous. Whether Colorado's law applies to a given speaker undeniably turns on "*what he intends to say*." *Id.*, at 742 (Scalia, J., dissenting) (emphasis in original). "A speaker wishing to approach another for the purpose of communicating *any* message except one of protest, education, or counseling may do so without first securing the other's consent." *Ibid.* Nevertheless, the Court deemed the law content neutral on the theory that it does not prohibit a particular viewpoint or a particular subject matter. *Id.*, at 723. But, this Court had never—and since *Hill*, has never—taken such a narrow view of content-based speech restrictions. Buffer zones like the one at issue in *Hill* are "obviously and undeniably content based." *Id.*, at 742 (Scalia, J., dissenting); accord, *id.*, at 767 (Kennedy, J., dissenting).

As a result of this error, the Court purported to subject the Colorado law to so-called "intermediate scrutiny," a standard far more lenient than the "strict scrutiny" we apply to content-based restrictions. And, the Court applied an

unusually flexible version of intermediate scrutiny. Ordinarily, any content-neutral burden on protected speech must be narrowly tailored to serve a significant state interest, and it must leave open ample alternative means of communication. See *id.*, at 749 (Scalia, J., dissenting). The *Hill* majority first minimized the burden imposed on First Amendment rights by demoting the right to speak in public forums to a mere "interest." *Id.*, at 714. The Court then declared that Colorado had a substantial interest in protecting its citizens' "right to avoid unwelcome speech." *Id.*, at 717. But, as Justice Scalia explained, the State had expressly disclaimed that interest in its briefs before the Court. *Id.*, at 750 (dissenting opinion). And with good reason, because "[w]e have consistently held that 'the Constitution does not *permit* government to decide which types of otherwise protected speech are sufficiently offensive to require protection *for the unwilling listener or viewer.*'" *Id.*, at 751 (quoting *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 210 (1975); emphasis in original). Nevertheless, that expressly disclaimed state interest became the "linchpin" of the Court's analysis. *Hill*, 530 U. S., at 750 (Scalia, J., dissenting).

Justice Scalia could identify only one explanation for the majority's anomalous decision: "[T]he jurisprudence of this Court has a way of changing when abortion is involved." *Id.*, at 742. *Hill* reflects "the 'ad hoc nullification machine'" that this Court "set[s] in motion to push aside whatever doctrines" happen to "stand in the way" of abortion. *Id.*, at 741.

*Hill*'s abortion exceptionalism turned the First Amendment upside down. As *Hill*'s author once explained, the First Amendment reflects a "'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 913 (1982) (majority opinion of Stevens, J.). That principle applies with per-

haps its greatest force to speech that society finds "offensive" or "disagreeable." *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989). Yet, *Hill* manipulated this Court's First Amendment jurisprudence precisely to disfavor "opponents of abortion" and their "right to persuade women contemplating abortion that what they are doing is wrong." 530 U. S., at 741–742 (Scalia, J., dissenting).

## II

It is unclear what, if anything, is left of *Hill.* As lower courts have aptly observed, *Hill* is "incompatible" with our more recent First Amendment precedents. *Price* v. *Chicago*, 915 F. 3d 1107, 1117 (CA7 2019) (opinion of Sykes, J., joined by Barrett, J.).

Start with *McCullen* v. *Coakley*, 573 U. S. 464 (2014). There, this Court unanimously held unconstitutional a Massachusetts law that prohibited anyone from entering a 35-foot buffer zone around an abortion facility. *Id.*, at 471–472, 497. In doing so, the Court determined that the law was content neutral because—rather than targeting certain kinds of speech such as protest, education, and counseling—the law prohibited virtually any speech within the buffer zone. *Id.*, at 479. The Court made clear, however, that the law "*would* be content based if it required 'enforcement authorities' to 'examine the content of the message'" to determine whether the law applied. *Ibid.* That position is irreconcilable with *Hill*, which the Court did not even bother to cite.

*Hill* is likewise at odds with *Reed* v. *Town of Gilbert*, 576 U. S. 155 (2015). *Reed* involved a First Amendment challenge to a town's sign code that regulated various categories of signs based on "the type of information they convey." *Id.*, at 159. Relying on *Hill*, the Ninth Circuit concluded that the sign code was content neutral, reasoning that the town "'did not adopt its regulation of speech because it disagreed

with the message conveyed'" and its "'interests in regulat[ing] temporary signs are unrelated to the content of the sign.'" 576 U. S., at 162. That court then applied a lower level of scrutiny and upheld the code. *Ibid.* We reversed, holding that a speech regulation is content based—and thus "presumptively unconstitutional"—if it "draws distinctions based on the message a speaker conveys." *Id.*, at 163.

*McCullen* and *Reed* "establish that strict scrutiny is the proper standard of review when a law targets a 'specific subject matter . . . even if it does not discriminate among viewpoints within that subject matter.'" *Bruni* v. *Pittsburgh*, 592 U. S. \_\_\_ (2021) (THOMAS, J., statement respecting denial of certiorari). That proposition presents "glaring tension" with *Hill*. 592 U. S., at \_\_\_; see also *Price*, 915 F. 3d, at 1118 ("In the wake of *McCullen* and *Reed*, it's not too strong to say that what *Hill* explicitly rejected is now prevailing law").

Our post-*Reed* decisions have firmly established *Hill*'s diminished status. In *City of Austin*, for example, the majority ran as far as it could from *Hill*, even though *Hill* was the one "case that could possibly validate the majority's aberrant analysis" on the constitutionality of restrictions on billboard advertising. 596 U. S., at 86, 102 (opinion of THOMAS, J.). The majority nonetheless insisted that any alleged similarity was "a straw man," rejecting the notion that its opinion had "'resuscitat[ed]'" *Hill*, and reminding readers that it did "not cite" the decision at all. 596 U. S., at 76.

Our latest word on *Hill*—expressed in a majority opinion joined by five Members of this Court—is that the decision "distorted [our] First Amendment doctrines." *Dobbs*, 597 U. S., at 287, and n. 65. If *Hill*'s foundation was "deeply shaken" before *Dobbs*, see *Price*, 915 F. 3d, at 1119, the *Dobbs* decision razed it.

This trajectory calls to mind the story of *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), which had created a three-part test to determine whether a law violated the Establishment

Clause. While this Court had not by any one statement overruled *Lemon*, for many years it either "expressly declined to apply the test" or "simply ignored it." *American Legion* v. *American Humanist Assn.*, 588 U. S. 29, 49 (2019) (plurality opinion) (collecting cases). We were never shy about *Lemon*'s "shortcomings" and "daunting problems." 588 U. S., at 49, 51. And, we eventually faulted lower courts for failing to notice that the "'shortcomings' associated with th[e] 'ambitiou[s],' abstract, and ahistorical" *Lemon* test had "bec[o]me so 'apparent' that this Court long ago abandoned" it. *Kennedy* v. *Bremerton School Dist.*, 597 U. S. 507, 534 (2022) (second alteration in original). In other words, we explained, *Lemon* had long been dismantled by our precedents, and lower courts should have recognized its demise. Given that prior to *Kennedy*, a decision of the Court had never outright condemned *Lemon* as a "distort[ion]," *Dobbs*, 597 U. S., at 287, and n. 65, *Hill*'s abandonment is arguably even clearer than *Lemon*'s.

To be sure, this Court has not uttered the phrase "we overrule *Hill*." For that reason, some lower courts have felt compelled to uphold *Hill*-like buffer zones around abortion clinics. See, *e.g.*, *Vitagliano* v. *County of Westchester*, 71 F. 4th 130, 141 (CA2 2023). This case is another prime example of that trend, and "[o]ne can hardly blame [lower courts] for misunderstanding" when "[w]e [have] created . . . confusion." *Gee* v. *Planned Parenthood of Gulf Coast, Inc.*, 586 U. S. 1057, 1059 (2018) (THOMAS, J., dissenting from denial of certiorari). We are responsible for resolving that confusion, and we should have done so here.

### III

Six months after this Court decided *Dobbs*, the city council of Carbondale, Illinois, passed Ordinance No. 2023–03, a buffer-zone restriction that copied nearly verbatim the Colorado law at issue in *Hill*. See Carbondale, Ill., City Code §14–4–2(H) (2023). The city council explicitly invoked

*Hill* as a justification for enacting the ordinance. See *Coalition for Life St. Louis* v. *Carbondale*, No. 3:23–cv–1651 (SD Ill.), Doc. 1–1, p. 3.

Petitioner Coalition Life is a Missouri nonprofit that organizes sidewalk counselors to counsel, educate, pray, display signs, and distribute literature outside abortion clinics. Their goal is to engage in "one-on-one conversation in a calm, intimate manner," as they find that approach most effective. Complaint in No. 3:23–cv–1651, p. 3, ¶10. The organization prohibits its counselors from engaging in intimidating or threatening behavior.

Until the passage of Ordinance No. 2023–03, Coalition Life counselors engaged in sidewalk counseling outside abortion facilities in Carbondale. But, the new ordinance "severely hinder[ed]" their ability to do so. *Id.*, at 11, ¶48. The newly enacted 100-foot buffer zone meant that Coalition Life counselors were forced to stand far away from those with whom they wished to speak. In some cases, sidewalk counselors had nowhere to stand but in the middle of busy roads, rendering intimate counseling activities effectively impossible.

Coalition Life sued the city of Carbondale, alleging, among other things, that the ordinance violates the First Amendment. When Carbondale moved to dismiss the suit under *Hill*, Coalition Life responded that over the years *Hill* has been eroded, but it nevertheless conceded that its claims were foreclosed insofar as *Hill* remains good law. The District Court dismissed the suit on the ground that *Hill* and binding Seventh Circuit precedent controlled. *Coalition for Life St. Louis* v. *Carbondale*, 2023 WL 4681685, *1 (SD Ill., July 6, 2023). The Seventh Circuit affirmed on the same ground, acknowledging the plaintiffs' assertion that Carbondale's buffer zone was "'modeled after and nearly identical'" to the one upheld in *Hill.* 2024 WL 1008591, *1 (Mar. 8, 2024). Because *Hill* was the exclusive basis for both decisions below, this case clearly and cleanly

THOMAS, J., dissenting

presents the question of *Hill*'s viability.*

This Court has received a number of invitations to make clear that *Hill* lacks continuing force. Some of those invitations have arisen in cases with thorny preliminary issues or other obstacles to our review. See, *e.g.*, *Bruni*, 592 U. S. ___ (opinion of THOMAS, J.). But, no such obstacles are present here. It is undisputed that Carbondale's ordinance is identical to Colorado's law in all material respects. It is likewise undisputed that both the District Court and the Seventh Circuit dismissed Coalition Life's suit exclusively on the ground that those courts felt bound by *Hill*. This case would have allowed us to provide needed clarity to lower courts.

*      *      *

*Hill* has been seriously undermined, if not completely eroded, and our refusal to provide clarity is an abdication of our judicial duty. "We are responsible for the confusion among the lower courts, and it is our job to fix it." *Gee*, 586 U. S., at 1059 (opinion of THOMAS, J.). I would have taken this opportunity to explicitly overrule *Hill*. For now, we leave lower courts to sort out what, if anything, is left of *Hill*'s reasoning, all while constitutional rights hang in the balance. I respectfully dissent.

––––––––––

*Carbondale repealed Ordinance 2023–03 in the summer of 2024. See An Ordinance Repealing Ordinance No. 2023–03, Carbondale, Ill., Ordinance No. 2024–__ (July 13, 2024). But, this fact is not fatal to petitioner's claims. The ordinance was in effect for over a year and a half, and Coalition Life sought nominal damages for the infringement of First Amendment rights. A plaintiff's request for nominal damages can satisfy the redressability requirement for Article III standing and keep an otherwise moot case alive. See *Uzuegbunam* v. *Preczewski*, 592 U. S. 279, 293 (2021).